IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

TOKIO MARINE AMERICA )
INSURANCE COMPANY, )
as subrogee of Sesaco )
Corporation, )
)
    Plaintiff, )
)
-vs- ) Civil Action
) No.:
PROMISE LAND FARMS, ) 1:15-cv-00760-SS
)
    Defendant and Third )
    Party Plaintiff, )
)
-vs- )
)
SESACO CORPORATION, )
)
    Third Party Defendant. )


DEPOSITION OF CAROL L. JONES, Ph.D., P.E.

TAKEN BY TELEPHONE ON BEHALF OF THE DEFENDANT

AND THIRD PARTY PLAINTIFF PROMISE LAND FARMS

IN OKLAHOMA CITY, OKLAHOMA

ON FEBRUARY 16, 2017


REPORTED BY:  SUSAN NARVAEZ, CSR
DODSON COURT REPORTING & LEGAL VIDEO, INC.
425 NORTHWEST 7TH STREET
OKLAHOMA CITY, OK 73102
(405)235-1828
http://www.dodsonreporting.net

A P P E A R A N C E S

For the Plaintiff:

      Kathryn L. Burkhart
      Attorney at Law
      28411 Northwestern Highway
      Suite 600
      Southfield, MI 48034


For the Defendant and Third Party Plaintiff
Promise Land Farms:
(By Telephone)
      Brent Howard
      Attorney at Law
      100 E. Ferguson Street
      Suite 1200
      Tyler, TX 75702


For the Third-Party Defendant Sesaco
Corporation:
(By Telephone)
      Richard Michael McRory
      Attorney at Law
      800 Gessner, Suite 250
      Houston, TX 77024

# T A B L E   O F   C O N T E N T S

                                                    PAGE

STIPULATIONS . . . . . . . . . . . . . .    4

EXAMINATION BY MR. HOWARD. . . . . . . .    5

JURAT. . . . . . . . . . . . . . . . . .   54

CORRECTION SHEET . . . . . . . . . . . .   55

REPORTER'S CERTIFICATE . . . . . . . . .   56

## S T I P U L A T I O N S

It is hereby stipulated and agreed by and between the parties hereto, through their respective attorneys, that the deposition of CAROL L. JONES, Ph.D., P.E., may be taken on behalf of the Defendant and Third Party Plaintiff on February 16, 2017, in Oklahoma City, Oklahoma, by Susan Narvaez, Certified Shorthand Reporter for the State of Oklahoma, pursuant to the Federal Rules of Civil Procedure, by notice.

* * * * * *

1          CAROL L. JONES, PH.D., P.E.

2    of lawful age, being first duly sworn, deposes

3    and says in reply to the questions propounded

4    as follows:

5                    *  *  *  *  *  *  *

6                    EXAMINATION

7    BY MR. HOWARD:

8        Q.   I think the witness was just sworn.

9             Dr. Jones, this is Brent Howard.  And

10   you're going to need to speak up pretty loud so

11   everybody can hear you.  Okay?

12       A.   I'll do that.  Good morning.

13       Q.   Good.  That's great.  The way you just

14   did it was perfect.

15       A.   I'll try to.  Well, just remind me if

16   I don't.

17       Q.   I'll chew you out if you do it wrong.

18   Okay?

19       A.   Please do that.  I've been chewed out

20   by the best.

21       Q.   That's good.  That's good.  Let me

22   tell you before we really get going here, Katie

23   has probably told you, I don't take long

24   depositions, so I don't think this is going to

25   take too long.  There's just a few things that

1    I want to cover with you.

2            I will ask you, Dr. Jones, do you plan

3    on testifying live at trial?

4        A.   Yes.

5        Q.   Okay.   Good.   That's what I figured.

6    So a lot of my cross examination will be done

7    at trial rather than today.   And of course, we

8    have an agreement with your attorney that if

9    you can't come to trial, they'll take a trial

10   deposition and we'll get all that worked out.

11   But hopefully you'll be able to be there.

12   Okay?

13       A.   Sounds good.

14       Q.   Dr. Jones, have you reviewed anything

15   related to this file since you wrote your

16   report?

17       A.   The last deposition from Norm Smith.

18       Q.   David Smith.

19       A.   David Smith?

20            MS. BURKHART:   Nathan.

21       A.   Nathan Smith.   Sorry.   Sorry.   It's

22   one of the N people.   Nathan Smith, yeah.   Mr.

23   Smith, I reviewed his testimony.

24       Q.   (By Mr. Howard) Okay.   Anything else?

25       A.   No.   I went back and reviewed some of

1    the documents from earlier before my report,

2    and then of course I reread my report.  But

3    nothing new other than Mr. Smith's testimony.

4        Q.    All right.  Have you ever been to the

5    Promise Land Farm's facility?

6        A.    No, sir.

7        Q.    Have you ever been to the Sesaco

8    facility in Hobart, Oklahoma?

9        A.    Yes, sir.

10       Q.    How many times?

11       A.    Once.

12       Q.    Was that for this case?

13       A.    No, sir.  Six years ago.

14       Q.    What was that occasion?  And I don't

15   need a lot of detail.

16       A.    They had just installed a new auger

17   system to move sesame through their plant and

18   they wanted to show it to me.  And so I went

19   down and met with a guy named Tom Speed.  I

20   don't believe he's with Sesaco any longer.  But

21   we walked through their plant as it was at that

22   time.  And that's all we did.

23       Q.    Gotcha.  Do you have any business

24   relationship with Sesaco in the past or at this

25   time other than being an expert in this case

1    that I'm asking you about today?

2        A.    No, sir.

3        Q.    All right.  Did you ever see the

4    sesame seed that was damaged in the fire in

5    this matter?

6        A.    No, sir.

7        Q.    Okay.  I want to ask you about the

8    Hobart plant -- I'm sorry, the Sesaco plant in

9    Hobart.  Does it have bins much like those at

10   Promise Land Farms?

11       A.    I've not seen Promise Land Farm's bins

12   other than the layout, the overhead layout.  So

13   I'm not sure.

14       Q.    Okay.  Do the bins at the Hobart

15   facility have aeration equipment?

16       A.    I don't remember.  They don't hold

17   sesame very long there.

18       Q.    Okay.  Why is it they don't hold

19   sesame very long there?

20       A.    My understanding is they have these

21   receivers out in the areas where they grow it

22   and they hold the sesame there until they're

23   ready to process it or package it at Hobart.

24       Q.    All right.  And of course Promise Land

25   Farms at the time of this incident was one of

1    those receivers, correct?

2         A.    All I know about that arrangement is

3    what's in the testimony that's been provided to

4    me.

5         Q.    Okay.  Have you ever seen the 2013

6    sesame receiver agreement?

7         A.    Yes.

8         Q.    And I think, according to that

9    agreement, PLF -- I don't think there's any

10   doubt, there's nobody disagreeing in this

11   matter -- that PLF was a receiver for Sesaco.

12   And that's your understanding as well?

13        A.    I believe that was in that agreement.

14   I'm not a contract specialist, so I'm not going

15   to be able to answer very many questions about

16   the contract.  But I believe in that contract

17   it said they were a receiver.

18        Q.    That's fair enough.  And I appreciate

19   that.  Do you know how many -- well, let's go

20   back to the year 2013 when this receiver

21   agreement was entered into and PLF was handling

22   sesame for Sesaco.  Do you know how many such

23   receivers as PLF Sesaco had in 2013?

24        A.    No, sir.

25        Q.    Do you have a ballpark figure?

1      A.   No, sir.  The only --

2      Q.   Do you know if PLF was the only one?

3      A.   I have no idea.

4      Q.   Do you know how many receivers Sesaco

5   has now?

6      A.   No, sir.

7      Q.   And I'm talking about in the United

8   States.  Okay?

9      A.   I have no idea.

10     Q.   Okay.  So if I were to ask you about

11   every year going back 30 years, your answer

12   would still be "I don't know how many receivers

13   they had."  Am I correct about that?

14     A.   That's correct.

15     Q.   That's fair enough.  Let's assume that

16   Sesaco did use other receivers other than PLF

17   in 2013.  If they did, do you know if those

18   other receivers had aeration equipment on their

19   bins?

20     A.   I would not know.

21     Q.   That's fair enough.  Can you describe

22   Sesaco for me, ma'am?  Tell me what you know

23   about Sesaco as it relates to sesame seed.

24     A.   They have developed genetic stock

25   where we can grow sesame in the United States.

1    I believe that they also import and export

2    sesame seed to the United States and outside

3    the United States.  That's my knowledge of what

4    they do with sesame.  But I think they're the

5    only ones in the United States that develop

6    genetic stock for sesame to be grown in the

7    United States.

8        Q.    Okay.  So I think that answers my

9    question.  As far as sesame in the United

10   States is concerned, is it your understanding

11   that Sesaco is either the only player in the

12   field or, if not the only one, certainly the

13   largest?

14            MS. BURKHART:  Object to the form.

15       A.    I don't know about the size.  There

16   are other people who import sesame to the

17   United States to be sold to restaurants and

18   food manufacturers, but I have no details about

19   their size and how they compare to Sesaco.

20       Q.    (By Mr. Howard) Let's take out

21   imported sesame from other countries.  As far

22   as sesame that is grown and harvested in the

23   United States, isn't it true that Sesaco is

24   either the only such company that does that or,

25   if not the only one, certainly the largest?

```
 1      A.    They're the only one I know of.

 2            MS. BURKHART:  Object to form.

 3      Q.    (By Mr. Howard) So certainly in 2013

 4    Sesaco would have had a lot of expertise in the

 5    harvesting, storing, et cetera, with sesame.

 6    Do you agree with that?

 7            MS. BURKHART:  Object to the form.

 8      A.    That would be my assumption, yes.

 9      Q.    (By Mr. Howard) Okay.  Tell the jury,

10    if you would -- and when I say that, I say

11    that, Dr. Jones, because this may be read to

12    the jury.  Tell the jury why moisture matters

13    with sesame.

14      A.    Moisture matters with sesame just like

15    it does with all biological products.  The

16    higher the moisture the more opportunities

17    microbial action can begin to develop.

18    Microbial action would be in the case of mold,

19    insect excrement, insect activity, spoilage.

20    It plays a part in the development of rancidity

21    in oil seeds.  And sesame is no different than

22    other oil seeds.  And in fact, other than the

23    oil content, that same microbial action can

24    happen in any product, including corn, wheat,

25    soybeans, barley, oats, any of the cereal
```

1    grains as well.

2        Q.   Sesaco's literature indicates that

3    moisture is especially important with sesame.

4    Do you agree with that?

5        A.   It's important in all of these

6    products.  I don't know that sesame is any -- I

7    wouldn't say that it's any more important with

8    sesame.  It's important in all biological

9    products.

10        Q.   Okay.  Do you agree that harvesting

11   sesame at below 6% moisture is critical?

12            MS. BURKHART:  Object to the form.

13        A.   I think below 7% is critical.

14        Q.   (By Mr. Howard) Do you know why

15   Sesaco's literature says 6%?

16        A.   I don't know why.

17        Q.   Okay.  But you would disagree with

18   that 6% figure?

19        A.   6% is certainly safe, but so is 7%.

20        Q.   Okay.  Why is the moisture content of

21   sesame important when it comes to storing

22   sesame in bins?

23        A.   Well, just like with any other

24   biological product -- when I say biological

25   product, I'm talking grain in this case, grain

1    and oil seeds, and sesame would be included in

2    that statement.  When the moisture content is

3    increased or is higher, then temperature really

4    becomes an important consideration.  The

5    temperature needs to be lower as the moisture

6    content goes higher so that we can discourage

7    microbial activity from developing in the bin.

8         Q.   How is moist important when it comes

9    to fire in a bin that's filled with sesame?

10        A.   Moisture content establishes an

11   environment for microbial activity to be

12   established.  And that microbial activity can

13   increase the temperature to the point,

14   especially in this case, of combustion, self

15   combustion.

16        Q.   All right.

17        A.   That was covered in my report.

18        Q.   And certainly Sesaco knew that before

19·  they entered into the receiver agreement with

20   Promise Land Farms, correct?

21             MS. BURKHART:  Object to form.

22        A.   I'm sure they probably did.  That's

23   common knowledge in the grain handling

24   industry.

25        Q.   (By Mr. Howard) If they didn't know

1    that, they certainly should have known it,

2    shouldn't they?

3              MS. BURKHART:  Object to form.

4              MR. McRORY:  Object to the form.

5         A.   I have no idea of what they should and

6    shouldn't know.

7         Q.   (By Mr. Howard) Okay.  Let me ask that

8    again.

9              MR. HOWARD:  And Rick, I'll give you

10   time to make your objection so we're not

11   talking over each other.

12 .      Q.   (By Mr. Howard) If Sesaco did not know

13   that moist sesame could internally combust

14   before they entered into the receiver agreement

15   of 2013 with Promise Land Farms, they certainly

16   should have known that, is that correct?

17             MS. BURKHART:  Object to the form.

18             MR. McRORY:  Objection, form.

19        A.   I have no --

20        Q.   (By Mr. Howard) You may answer, Dr.

21   Jones.

22        A.   Excuse me?

23        Q.   I said you may answer.

24        A.   Okay.  I don't know what they should

25   and shouldn't have known.  That is a common

1    knowledge in the grain industry.  It's common

2    knowledge in the hay handling industry as well.

3        Q.    Okay.  The seed that was in Bin 30 --

4    and it's your understanding we're talking about

5    Bin 30, correct?

6        A.    Correct.

7        Q.    All right.  And when I talk about the

8    sesame seed that was burned or destroyed or

9    whatever, I'm talking about Bin 30, so we're

10   talking about the same thing.  Okay, Dr. Jones?

11       A.    Sounds good.

12       Q.    The seed that was deposited in Bin 30

13   at Promise Land Farms is what is referred to as

14   out-of-condition seed, is that correct?

15       A.    That's my understanding.

16       Q.    And I don't think there's any dispute

17   about that.  Tell the jury, if you would, what

18   your understanding of what out-of-condition

19   seed is.

20       A.    With respect to sesame, it has extra

21   add mixture which is foreign material.  It

22   could be other kinds of seeds.  It could be

23   chaff, grass seeds.  They did not say in any of

24   the testimony that I recall what that add

25   mixture was.  But it had add mixture in it.

1                The moisture content was a little bit

2      higher.  I believe it was at 9%.  They were

3      allowing 9% moisture content, which is of no

4      concern other than as moisture content

5      increases more diligence needs to be in place

6      to maintain that product in storage.

7          Q.   Let me stop you there.  Did Sesaco let

8      Promise Land Farms know that because they were

9      accepting moisture content sesame up to 9% that

10     that needed to be more diligently observed?

11               MS. BURKHART:  Object to form.

12         A.   I don't recall seeing that in any of

13     the literature or any of the documents, but

14     that's certainly something anyone who handles

15     grains, has had any experience with grain,

16     already knows.  That's common industry

17     knowledge.

18         Q.   (By Mr. Howard) Okay.  And of course,

19     Sesaco would have known that, correct?

20         A.   I have no idea what they knew and

21     didn't know.

22         Q.   Okay.  All right.  Did you complete

23     your definition as to what you believe

24     out-of-condition sesame is?

25         A.   Yes, sir.  I might add to that,

1    sometimes when we call sesame out of condition,

2    the acid values can be a little higher than

3    perfect in-condition sesame.  So I think that

4    would be the only other thing I would add to

5    that explanation.

6         Q.    Okay.  That's good.  I wanted to let

7    you give a complete explanation.

8         A.    Thank you.

9         Q.    Okay.  Did Sesaco know prior to

10   entering into the receiver agreement with

11   Promise Land Farms that high moisture sesame

12   can heat up in trucks and silos and become

13   worthless?

14             MS. BURKHART:  Object to the form.

15        A.    I have no idea what they knew.

16        Q.    (By Mr. Howard) If their literature

17   states that, would you assume that they knew

18   that?

19             MS. BURKHART:  Object to form.

20        A.    That I would be an assumption.  And I

21   don't know what they know and don't know.

22        Q.    (By Mr. Howard) Okay.  Do you have any

23   idea what expertise anybody with Sesaco had as

24   far as storing grain at a reserving facility?

25        A.    No, sir.

1      Q.   Okay.  Why was it important for Sesaco

2  to have Promise Land Farms segregate

3  out-of-condition sesame from good sesame?

4      A.   I don't know what their reasoning was,

5  but generally when -- in the industry when we

6  segregate grain it's due to marketing

7  considerations.  They may have had a customer

8  that required characteristics that would not be

9  met by that out-of-condition or the Bin 30

10  grain.

11      Q.   Okay.  Did it have anything to do with

12  fire safety or the possibility of ruining the

13  sesame?

14      A.   Not that I know of.

15      Q.   Okay.  Is it your understanding from

16  what you've reviewed that it had been the

17  intention of Sesaco to remove the

18  out-of-condition sesame from Bin 30 quicker

19  than they did?

20           MS. BURKHART:  Object to the form.

21      A.   I'm not a contract expert, so I'm not

22  real sure what was in the contract or what was

23  conveyed between the two parties about when to

24  remove the grain.

25      Q.   (By Mr. Howard) Okay.  And I'm not

1   talking about the contract.  I'm primarily

2   talking about what Mr. Fullington would have

3   discussed with Promise Land Farms folks about

4   removing sesame from Bin 30 quickly.  Do you

5   recall any of that?

6       A.   No, sir.

7       Q.   Okay.  Do you have -- assume with me

8   that it was Mr. Fullington's intention to

9   remove the sesame from Bin 30 within a matter

10  of weeks rather than months.  Do you have any

11  idea why he did not do that?

12           MR. McRORY:  Objection, form.

13      A.   I don't know why he didn't do that.

14  My assumption would be that he didn't have a

15  market for it, but I don't have any

16  documentation that says that.

17      Q.   (By Mr. Howard) But to be fair to you,

18  you don't know one way or another really?

19      A.   Exactly.

20      Q.   We know that Mr. Fullington went out

21  in April and inspected several bins, including

22  Bin 30.  I want you to assume with me that

23  after that April inspection, it was again Mr.

24  Fullington's intention to promptly remove the

25  sesame from Bin 30.  Do you know why that was

1    not done?

2              MS. BURKHART:  Object to form.

3        A.   I do not know.

4              MR. McRORY:  Object to the form.

5        Q.   (By Mr. Howard) Okay.  That's fair

6    enough.  In your review of the documents, Dr.

7    Jones, I'm sure you've seen that most of the

8    witnesses discussed an initial receipt of

9    sesame when testing was done and then weekly

10   inspections that were to have been performed

11   after that sesame was accepted and placed in

12   bins.  Do you recall that testimony?

13       A.   I recall that there were receipts as

14   they received the sesame.  And that's typical

15   of any grains -- grain receiver.  I saw that

16   they were supposed to do the weekly

17   inspections, but I didn't see any documentation

18   where those inspections were carried out or I

19   never saw any procedures of -- any

20   documentation of the procedures they were

21   following in their inspections.

22       Q.   Okay.  I want to talk to you just a

23   second about the initial receipt of sesame.

24   Okay?

25       A.   Okay.

1      Q.    So we'll both know what we're talking

2    about.

3      A.    Thank you.

4      Q.    Okay?

5      A.    Yes.

6      Q.    Okay.  To my knowledge, no witness in

7    this litigation has stated that they have a

8    complaint about the way that Promise Land Farms

9    performed that initial receipt of sesame.  Do

10   you agree with that?

11     A.    Yes, sir.

12     Q.    Do you have any complaint about the

13   way Promise Land Farms performed the initial

14   receipt of sesame?

15     A.    No, sir.

16     Q.    Okay.  That's going to save a lot of

17   time.  So we know what we're talking about.

18     A.    Okay.

19     Q.    I assume that you agree, as Nathan

20   Smith agreed with me, that the issue in this

21   litigation involves the weekly inspections.  Is

22   that a fair statement?

23     A.    Yes, sir.

24     Q.    And I think you kind of just.

25   summarized what your complaint is.  Is that

1    right?

2        A.    Well, I don't know what to complain

3    about because there was no documentation

4    telling me how those inspections were done.

5    So, yes, that is a major concern.

6        Q.    Okay.  Would it be fair to say that,

7    as we sit here today and I ask you these

8    questions, you don't know what weekly

9    inspections were performed by Promise Land

10   Farms or if they were performed or in what

11   manner they were performed?

12           MS. BURKHART:  Object to form.

13       A.    We have testimony that is conflicting

14   in what inspections were carried through.  So,

15   no, I'm not sure what they did.

16       Q.    (By Mr. Howard) Okay.  And I just want

17   to make sure that's clear on the record.  As we

18   sit here today, you can't tell the jury what

19   weekly inspections were performed by Promise

20   Land Farms?

21       A.    That's correct.  There's no

22   documentation.

23       Q.    Okay.  Do you agree with Mr. Smith

24   when he testified that the only evidence he has

25   that weekly inspections weren't performed

1    properly is the fire itself?

2         A.    I don't agree with that.

3         Q.    Tell me why you disagree with that.

4         A.    We don't have any documentation that

5    they were performed other than the testimony --

6    I think there's two or three individuals that

7    gave testimony.  None of that testimony

8    indicated a proper inspection process.

9         Q.    Okay.  What did Mr. Fullington say he

10   thought the proper inspection process was for

11   the weekly inspections?

12        A.    Could you repeat that, please?

13        Q.    Yes, ma'am.  What procedure did Mr.

14   Brad Fullington describe as the proper

15   procedure for PLF to perform the weekly

16   inspections?

17        A.    I don't know what his understanding of

18   the proper procedure was, but I believe what

19   he, in his testimony -- and I don't have that

20   in front of me, so, you know, this is going to

21   be my memory of that.

22        Q.    Sure.

23        A.    He would open the bin, look in with a

24   flashlight, and that was the whole summation of

25   his inspection process.

1      Q.    All right.  If Mr. Fullington was the

2   person that was PLF's contact on how to perform

3   weekly inspections, do you have an opinion as

4   to whether or not Mr. Fullington properly and

5   adequately instructed Promise Land Farms'

6   employees and representatives?

7               MS. BURKHART:  Object to form.

8               MR. McRORY:  Objection, form.

9      A.    Could you ask that again, please?  I

10   don't understand that question.

11      Q.    (By Mr. Howard) Okay.  I want you to

12   assume with me, which I think is true, that

13   Promise Land Farms' contact was Brad

14   Fullington.  And I want you to assume that Mr.

15   Fullington is the person that would have

16   instructed or graded the papers of Promise Land

17   Farms on how to conduct weekly inspections.  If

18   what you just described is how Mr. Fullington

19   instructed Promise Land Farms to perform weekly

20   inspections, is it your opinion that Mr.

21   Fullington improperly instructed Promise Land

22   Farms?

23               MS. BURKHART:  Object to form.

24               MR. McRORY:  Objection, form.

25      A.    I don't remember any documentation

1    saying that Mr. Fullington instructed Promise

2    Land how to perform inspections.  Promise Land

3    has experience in handling grain.  That's

4    common industry knowledge on how to inspect a

5    grain bin and the product inside of it.  So I

6    would -- if we're going to assume things here,

7    I would assume that Promise Land knew how to

8    inspect a grain bin without instruction.

9    That's common industry knowledge.

10          MR. HOWARD:  Okay.  I'll object to

11   that last part as nonresponsive.

12       Q.   (By Mr. Howard) If you don't know what

13   weekly inspections were performed by Promise

14   Land Farms, how can you tell the jury what you

15   think Promise Land Farms did wrong in those

16   weekly inspections, other than not documenting

17   the inspections?

18          MS. BURKHART:  Object to form.

19          MR. McRORY:  Objection, form.

20       A.   They did not -- they did not

21   apparently notice that the crop was going out

22   of condition to the point of self combustion.

23   That's not a process that happens quickly.  It

24   would take, I would estimate, at least six

25   weeks.  The rancidity of that seed would have

1   been noticed by odor long before we saw any

2   indication of a fire.  So apparently they

3   didn't notice those things because they didn't

4   tell Sesaco of the problem.

5       Q.    (By Mr. Howard) Okay.  Anything else?

6       A.    The problem with Bin 30 didn't happen

7   over night.  It would have taken longer than a

8   week.  So if they were doing inspection, they

9   did not report the problems that were inherent

10  in that bin at that time.

11      Q.    Okay.  Assume with me again that Mr.

12  Fullington's intention was to remove the sesame

13  from Bin 30 within two weeks to a month.  We

14  know that had he done that there wouldn't have

15  been a fire, is that correct?

16          MS. BURKHART:  Object to form.

17          MR. McRORY:  Objection, form.

18      A.    I don't really know how to answer

19  that.  If I were to leave this building right

20  now and it's not on fire I wouldn't burn up

21  either.  So, you know, if we're assuming

22  things, if they had taken it out the day that

23  he was there, there was no fire, so the crop

24  would not have burnt.

25          MR. HOWARD:  Okay.  And I'll object to

1    that as nonresponsive.

2        Q.   (By Mr. Howard) We know when Mr.

3    Fullington came out in April, it was his

4    intention to remove the sesame from Bin 30

5    within a couple of weeks.  We know that had he

6    done that as he intended, there would have been

7    no fire, is that correct?

8            MS. BURKHART:  Object to form.

9            MR. McRORY:  Objection to form.

10       A.   I don't know what his intentions were.

11       Q.   (By Mr. Howard) Pardon me?

12       A.   I don't know what his intentions were.

13   Had he --

14       Q.   I apologize.  That was not my

15   question.

16       A.   Okay.

17       Q.   I want you to assume that it was his

18   intention to remove the sesame within a couple

19   of weeks or so.  Is it true that had he done

20   that, there would have been no fire?

21           MR. McRORY:  Objection, form.

22       A.   I don't know within two weeks whether

23   there would be a fire or not.  There would not

24   have been a fire the day he was there.

25       Q.   (By Mr. Howard) Okay.  Do you think

1    the process of the sesame ruining started

2    within two weeks of April when he performed his

3    inspection?

4        A.    Not knowing what the condition with

5    all of the chemical constituents and all that

6    of that product was at that point, a simple

7    visual inspection that day would not have given

8    enough information to know whether the process

9    had already started that would culminate in the

10   fire.

11       Q.    Do you know what inspection Mr.

12   Fullington performed in April?

13       A.    I don't know all of the details of

14   that inspection, no.

15       Q.    Do you know any of the details?

16       A.    I know that he looked in the bin.  He

17   checked whatever moisture content records that

18   were available.  He looked at the records of

19   the acid levels, and they looked okay.

20       Q.    Assume with me again that it was Mr.

21   Fullington's intention after that April

22   inspection to move the sesame quickly from Bin

23   30.  With that assumption, do you have any

24   knowledge of why that was not done?

25       A.    I have no knowledge of that.

1              MR. McRORY:  Objection, form.

2         Q.   (By Mr. Howard) Tell me, if you would,

3    Dr. Jones -- you've already talked about the

4    weekly inspections, but you're certainly

5    welcome to go into a little bit more detail.  I

6    want to know when we get to trial what the

7    complaints you're going to have with Promise

8    Land Farms that you believe caused or

9    contributed to the sesame in Bin 30 being

10   ruined.

11        A.   We have no indication of the use of

12   their aeration system.  And there's certainly

13   no written records of that.  And that's an

14   industry standard to use aeration to maintain

15   the temperature and the grain quality within

16   the bin.  In fact --

17        Q.   Let me stop you there.  We know that

18   Promise Land Farms and PLF's -- I'm sorry.  We

19   know that Promise Land Farms and Sesaco's

20   agreement was controlled by the 2013 sesame

21   seed receiver agreement.  And I'm not trying to

22   make a lawyer out of you, but we know that that

23   was the agreement between the two parties, is

24   that correct?

25              MS. BURKHART:  Object to form.

1        A.    They had an agreement, yes.

2        Q.    (By Mr. Howard) Okay.  Did anything in

3    that agreement or any other agreement between

4    Sesaco and Promise Land Farms call for the use

5    of an aeration system while sesame was being

6    stored at Promise Land Farms?

7        A.    Sesaco inspected the facilities at

8    Promise Land.  There was aeration on those

9    bins.  The fans were sitting there and they saw

10   that there was aeration.  That's a common

11   practice.  And it's industry standard or best

12   management practice, whichever you want to call

13   it, that if those aeration fans are available,

14   that the owner of that bin and those aeration

15   fans would use those in the process of keeping

16   a product in condition.

17            MR. HOWARD:  I will object to that as

18   nonresponsive.  I don't think that was my

19   question.  And I probably asked a bad question.

20       Q.    (By Mr. Howard) Is there anything, to

21   your knowledge, in the 2013 sesame seed

22   receiver agreement that calls for the use of

23   aeration equipment or even for the receiver to

24   have aeration equipment?

25       A.    I don't remember that being spelled

1    out in the contract.  What is in the contract

2    that I remember, and please bear in mind I'm

3    not a contract expert here, but what I remember

4    reading in that contract is that Promise Land

5    was required to keep that product in as good a

6    condition as when they received it.  It is

7    implied in the grain industry that with an oil

8    seed, that means using aeration to maintain the

9    temperature.

10        Q.   Do you know if anybody at Sesaco ever

11   expressed that to Promise Land Farms?

12        A.   I do not know.

13        Q.   Okay.  Do you have any idea if Sesaco

14   in 2013 required their receivers to have

15   aeration equipment on their bins?

16        A.   I do not know.

17        Q.   Okay.  You talked about what PLF was

18   required to do.  Does --

19             MS. BURKHART:  Katie, do you have a

20   copy of that 2013 sesame seed receiver

21   agreement?

22             MS. BURKHART:  No, I don't.  I can

23   pull it up on my computer, if needed.

24             MR. HOWARD:  I think it might be

25   better, instead of me just reading it to her.

1    If you want to pull that up real quick, I'm

2    just going to ask her about a couple of things

3    in there.

4         MS. BURKHART:  Sure.  Give me one

5    second and I'll let you know.

6         MR. HOWARD:  Absolutely.  And I should

7    have sent one.  I didn't think about it.

8    Q.   (By Mr. Howard) While she's doing

9    that, Dr. Jones, do you know if before the 2013

10   sesame seed receiver agreement was entered into

11   if aeration was ever discussed between Promise

12   Land Farms and Sesaco?

13   A.   I do not know.

14   Q.   Do you know if before that agreement

15   was entered into if Sesaco knew whether or not

16   Promise Land Farms had aeration equipment on

17   their bins?

18   A.   I believe they inspected the facility

19   before they entered into the agreement, so they

20   would have seen the fans.

21   Q.   Okay.

22        MS. BURKHART:  All right.  Brent, I

23   have it up on my computer.

24        MR. HOWARD:  Okay.  Good.

25   Q.   (By Mr. Howard) If you would go down,

1    Dr. Jones, to Paragraph Number 3 on Page 1 of

2    that sesame seed receiver agreement.  It is

3    headed Equipment.  Do you see that?

4         A.    I see that.

5         Q.    The first sentence says, "Receiver,"

6    and that's Promise Land Farms, "shall have the

7    capability to store both good seed and handle

8    out-of-condition seed."  Do you see that first

9    sentence?

10        A.    I see that.

11        Q.    Do you believe that at all times

12   relevant to this matter that Promise Land Farms

13   did indeed have the capability to store both

14   good seed and handle out-of-condition seed?

15        A.    They had the equipment to do that.

16   There's more -- when you say capabilities, that

17   includes more than just equipment.  They need

18   to have the knowledge to use that equipment.

19   And so that would be included in my answer.

20             MR. HOWARD:  And I'll object to that

21   as nonresponsive.

22        Q.    (By Mr. Howard) My question was not

23   what they did or didn't do wrong.  It was

24   simply did they have the capability to store

25   both good seed and handle out-of-condition

1    seed?

2        A.    I would agree with that.

3              MS. BURKHART:  Object to form.

4        Q.    (By Mr. Howard) Okay.  The next

5    sentence says, "The out-of-condition seed,"

6    which we've already established is what we're

7    dealing with in Bin 30, "may be stored in a

8    separate tank, in bin bags, in a truck or a

9    suitable equivalent."  Do you see that?

10       A.    Yes, sir.

11       Q.    What's a bin bag?

12       A.    A bin bag is a tote bag made of -- oh,

13   it's a combination of plastic and fiber

14   material.

15       Q.    That doesn't have aeration equipment,

16   does it?

17       A.    They can have, yes.

18       Q.    Okay.  It says that the

19   out-of-condition seed could have been stored in

20   a truck.  What kind of truck are they talking

21   about there?

22       A.    I don't know.

23       Q.    Does a truck have aeration equipment?

24       A.    It can have, yes, sir.

25       Q.    Okay.  Describe a truck that has

1    aeration equipment.

2        A.    Truck aeration equipment is a fan that

3    is hooked to a long tube that is placed at the

4    front or the back of the truck and the air

5    moves through the truck and exits the other

6    end, hooked to electricity.  Used quite often

7    to dry products into cool products.

8        Q.    Describe a bin bag that has aeration

9    equipment.

10       A.    The same kind of aeration process is

11   used in a bin bag or a tote bag.  It's a

12   portable aeration system that has a fan with a

13   nozzle, a big long nozzle, so to speak, on the

14   end of it.  It looks like -- very much like the

15   same system that would be used in the truck.

16       Q.    Okay.  What was meant in this receiver

17   agreement by, quote, suitable equivalent?

18            MS. BURKHART:  Object to form.

19       A.    I don't know.  I don't know.

20       Q.    (By Mr. Howard) That's fair enough.

21   Pursuant to this agreement, Dr. Jones, could

22   Promise Land Farms have shipped out sesame seed

23   from any bin without the approval of Sesaco?

24       A.    I don't know that.

25       Q.    Okay.  That's fair enough.  To your

1    knowledge, Dr. Jones, did Promise Land Farms

2    ever ruin good sesame seed by adding it to

3    out-of-condition seed?

4         A.    I don't know that either.

5         Q.    You don't have an opinion one way or

6    another?

7         A.    No.

8         Q.    Do you have any evidence that Promise

9    Land Farms ever ruined good seed by adding

10   out-of-condition seed to it?

11        A.    No, sir.

12        Q.    Okay.  Now, let's go down.

13             MR. HOWARD:  Katie, if you don't mind,

14   if you would show Dr. Jones Paragraph 7 which

15   talks about care of seed.

16             MS. BURKHART:  Sure.  Give me one

17   second and I'll get there.

18             MR. HOWARD:  Please.  Thank you.

19             MS. BURKHART:  All right.  I have

20   Paragraph 7 in front of her.

21             THE WITNESS:  I've got it.

22             MR. HOWARD:  Thank you.

23        Q.    (By Mr. Howard) Dr. Jones, we have

24   established with Mr. Smith, I believe, that,

25   other than insurance issues, the dispute in

1    this cause of action boils down to that

2    Paragraph 7.  Do you agree with that?

3         A.    Let me read the paragraph here for a

4    second.

5         Q.    Please take all the time you need,

6    Doctor.

7         A.    Thank you.  Okay.  Could you ask the

8    question again, please?

9         Q.    Yes, ma'am.  We have established, I

10   believe, with Nathan Smith that, other than

11   insurance issues, the dispute in this

12   litigation boils down to that Paragraph 7, Care

13   of Seed.  Do you agree with that?

14        A.    I agree with that.

15        Q.    Okay.  That first sentence says that

16   "Receiver shall protect the seed" -- and I'm

17   going to go through this kind of slowly with

18   you -- "from moisture."  Do you have any

19   evidence that PLF did not protect sesame seed

20   at their facility from moisture?

21        A.    Yes, sir, I think the fire is that

22   evidence.

23        Q.    Okay.  Anything else that's evidence?

24        A.    No, sir.

25        Q.    How much moisture was added to the

1    seed after it was deposited in Bin 30?

2           MS. BURKHART:   Object to form.

3       A.    That's something we can't quantify.

4    It was enough to cause bacterial growth or

5    microbial activity so that the grain went ahead

6    and spontaneously combusted.   It could have

7    come from condensation and it could have come

8    from a leak in the bin.

9       Q.    (By Mr. Howard) Okay.   Do you have any

10   evidence that any additional moisture was added

11   to the seed in Bin 30 after it was initially

12   deposited in Bin 30?

13      A.    When you say "added," do you mean

14   someone pouring --

15      Q.    It getting in because of a leak,

16   because of rainfall, as opposed to just being

17   the moisture that was already in the

18   out-of-condition seed.

19      A.    Excess moisture came from some place,

20   yes, in the bin.   It could have been from

21   condensation.

22      Q.    And that condensation would have been

23   from the moisture that was already on the seed

24   when it was first deposited, correct?

25      A.    No.

1          MR. McRORY:  Objection to form.

2     A.   It can come out of the air that enters

3  in through the bin through, oh, things like

4  their vent system, leaks, air leaks in the bin.

5  As temperature changes, if you have more than

6  15 degree temperature change, then condensation

7  can occur because the water comes out of the

8  air.

9     Q.   (By Mr. Howard) We know, don't we, Dr.

10 Jones, that once sesame is deposited in a bin

11 such as was done at Bin 30, that sesame doesn't

12 get any better, is that correct?

13    A.   That's correct.

14    Q.   We know it either stays the same or

15 gets worse, correct?

16    A.   Correct.

17    Q.   And Sesaco knew that, correct?

18         MS. BURKHART:  Object to form.

19    A.   I don't know what Sesaco knew.

20    Q.   (By Mr. Howard) Okay.  That's fair

21 enough.  Going back to this Paragraph 7, it

22 says, "Receiver shall protect the seed from

23 chemicals."  Do you have any evidence that

24 Promise Land Farms did not protect the seed in

25 Bin 30 from chemicals?

1       A.    No, sir.

2       Q.    Do you have any evidence that Promise

3    Land Farms did not protect the seed in Bin 30

4    from fuels?

5       A.    No, sir.

6       Q.    Do you have any evidence that Promise

7    Land Farms did not protect the seed in Bin 30

8    from fertilizers?

9       A.    No, sir.

10      Q.    That they did not protect the seed in

11    Bin 30 from other grains?

12      A.    I have no evidence of that.

13      Q.    Any evidence that Promise Land Farms

14    did not protect the seed in Bin 30 from bird

15    excrement?

16      A.    No evidence.

17      Q.    Any evidence that Promise Land Farms

18    did not protect the seed in Bin 30 from

19    rodents?

20      A.    No, sir.

21      Q.    Any evidence that Promise Land Farms

22    did not protect the seed in Bin 30 from

23    insects?

24      A.    No evidence.

25      Q.    Further down in Paragraph 7 it says,

1    "If there are any storms, the storage facility

2    shall be inspected for water damage."  Do you

3    have, first of all, any knowledge as to whether

4    the sesame seed in Bin 30 -- or let me start

5    over.

6           Do you have any evidence if the seed

7    in Bin 30 itself was ever exposed to any

8    storms?

9           MS. BURKHART:  Object to form.

10   A.    I have no evidence of a storm record.

11   Q.    (By Mr. Howard) Okay.  If Bin 30 was

12   exposed to storms, do you know one way or

13   another whether or not Bin 30 was inspected by

14   Promise Land Farms for water damage?

15          MS. BURKHART:  Object to form.

16   A.    I believe Mr. Boling testified that he

17   looked at the bin after a storm.

18   Q.    (By Mr. Howard) Okay.  Do you have any

19   opinion as to whether or not that inspection

20   performed by him was done properly or not?

21   A.    There was no documentation and no

22   information on how he performed that

23   inspection.  So no.

24   Q.    Is that your way of saying you can't

25   say one way or another?

1     A.    That's my way of saying that, yes,

2  sir.

3     Q.    Okay.  We have here also in Paragraph

4  7 that Promise Land Farms was to have conducted

5  weekly inspections.  Tell the jury what in Dr.

6  Jones' mind "weekly inspections" means.

7     A.    Okay.  My opinion of that is -- comes

8  from best management practices in the grain

9  industry that are published by universities and

10  by industry representatives and different

11  companies, particularly aeration fan companies.

12  What that includes is opening the access points

13  of the bin.  Many times that's the roof access

14  points.  Actually smelling inside the bins.

15  That means you need to break the plane of that

16  access point.  Looking in the bin with enough

17  light to see the entire top surface of that

18  grain bulk.  Taking a moisture sample if

19  there's any reason for doubt as to whether you

20  can tell the quality of the grain from the

21  visual inspection.

22           You would need to determine the

23  temperature of the grain in the bin, either

24  through the use of temperature cables.  I don't

25  believe these bins had temperature cables.  I

1    never saw any mention of that.  So in the

2    absence of a temperature cable -- of

3    temperature cable data, some kind of assessment

4    of the temperature needs to be made of the

5    grain bulk itself.  That can be done with

6    handheld thermometers, thermistors.  There's

7    several methods of doing that.  You can even

8    test the exhaust at the fan level, the

9    temperature of that air coming out of the bin

10   and get somewhat of an idea of what the grain

11   temperature is within the bin.

12          But knowing the temperature of that

13   grain inside the bin on a weekly inspection is

14   critical.  Those would be the things that would

15   be contained in a weekly inspection.

16     Q.   Okay.  Now, you've just told me what

17   Dr. Jones expects of a weekly inspection.  As

18   you sit here today, do you have any idea what

19   Sesaco expected from a weekly inspection?

20          MS. BURKHART:  Object to form.

21     A.   I don't know what they expect.

22     Q.   (By Mr. Howard) Okay.  And I'm going

23   back to 2013 when this sesame receiver

24   agreement was in effect.  I take it you don't

25   know what they inspected as far as weekly

1   inspections at that point either.  Am I correct

2   about that?

3            MS. BURKHART:  Object to form.

4       A.   That's correct.  It was not in the

5   documentation.  In the grain industry, that's

6   kind of --

7            MR. HOWARD:  I'm going to object to

8   this as nonresponsive.  My question is very

9   simple.  I'll ask it again.

10      Q.   (By Mr. Howard) Is it true that in

11  2013 and 2014, during that time period of --

12  during that time period, you don't know what

13  Sesaco expected Promise Land Farms to perform

14  as far as weekly inspections of sesame, is that

15  correct?

16           MS. BURKHART:  Object to form.

17      A.   I do not know what they expected.

18  It's not in the documentation.

19      Q.   (By Mr. Howard) Thank you.  I want you

20  to assume with me this.  That Sesaco believed

21  that a weekly inspection that they expected was

22  as follows.  Okay?  "It would be to look at the

23  seed itself from the top of the bin, put a

24  flashlight in, make sure there's - you know,

25  with a flashlight you can see bug movement on

1    top.  You open up the bin.  You can smell an

2    objectionable odor.  And then also with a

3    flashlight you could see if water had gotten in

4    and there was sprouting of the sesame on top."

5    If that is what Sesaco expected of Promise Land

6    Farms, do you fault what Sesaco expected?

7                    MS. BURKHART:  Object to form.

8                    MR. McRORY:  Objection, form.

9         A.    I believe they should -- the

10   temperature is an important consideration.  And

11   that may have been able to be detected if

12   there's an excess temperature in the head space

13   as you were taking the odor assessment.

14        Q.    (By Mr. Howard) Okay.  If, again, what

15   I just read is what Sesaco expected of Promise

16   Land Farms, is that your only complaint with

17   Sesaco's expectation?

18                    MR. McRORY:  Object to form.

19                    MS. BURKHART:  Object to form.

20        A.    Yes, sir.

21        Q.    (By Mr. Howard) Pardon me?

22        A.    Yes, sir.

23        Q.    Okay.  Do you have a complaint with

24   Promise Land Farms if they indeed followed what

25   Sesaco says they expected as far as weekly

1    inspections are concerned?

2        A.    Had they followed --

3              MR. McRORY:  Object to form.

4        A.    Ask the question again, please.

5        Q.    (By Mr. Howard) Yes, ma'am.  Do you

6    have a complaint with Promise Land Farms in

7    this litigation if they followed what Sesaco

8    expected be performed as far as weekly

9    inspections are concerned?

10             MS. BURKHART:  Object to form.

11             MR. McRORY:  Objection, form.

12       A.    In my opinion, they should have

13   documented those inspections.

14       Q.    (By Mr. Howard) Okay.  Anything else?

15       A.    Well, I'm not sure that those

16   inspections were actually done in that manner

17   because they didn't detect the odor that would

18   have been -- that would have occurred well

19   before the fire.  So I don't really know how to

20   answer your question.  If they were following

21   Sesaco's instructions, they would have noticed

22   some problems well before the fire started.

23             MR. HOWARD:  I'll object to that as

24   nonresponsive.  My question was --

25       Q.    (By Mr. Howard) We've already

Page 48

```
 1   established and I've already asked you

 2   questions about what you think Promise Land

 3   Farms did wrong as far as weekly inspections.

 4   My question is different.  My question is how

 5   you fault Promise Land Farms if they indeed

 6   performed inspections as Sesaco said they

 7   should be performed?

 8            MS. BURKHART:  Object to form.

 9        Q.   (By Mr. Howard) And I think you've

10   told me the only thing you have that you

11   believe is that there should have been some

12   temperature gauges, is that correct?

13            MS. BURKHART:  Object to form.

14        A.   Correct.

15            MR. HOWARD:  Let me -- I may be silent

16   here for just a second.  I'm going to go

17   through my notes.  Believe it or not, I'm

18   getting close to the end.  Okay, Dr. Jones?

19            THE WITNESS:  Okay.  Take your time.

20            MR. HOWARD:  I'm going to try not to

21   go back over anything I've already done.

22            THE WITNESS:  Thank you.

23            MR. HOWARD:  Rick and Katie, I assume

24   you two are not going to ask any questions?

25            MS. BURKHART:  Correct.
```

1          MR. McRORY:  That's right.

2          MR. HOWARD:  Okay.  I was going to let

3    you go ahead if you were.  Let me take just a

4    second and go through this.  Is that okay with

5    everybody?

6          MS. BURKHART:  Sure.  That's fine.

7    We'll do a five -- do you want to do a quick

8    five-minute break?

9          MR. HOWARD:  Sure.  We'll just stay on

10   the line and we'll do that.  Okay?

11          MS. BURKHART:  Sounds good.

12                    (Recess.)

13      Q.   (By Mr. Howard) Dr. Jones, during the

14   time Promise Land Farms was storing sesame at

15   their facility, did Sesaco ever instruct

16   Promise Land Farms to use aeration equipment?

17      A.   I don't know.

18      Q.   If they did, that would tell us that

19   Sesaco certainly knew how to instruct Promise

20   Land Farms in the use of aeration equipment,

21   correct?

22          MS. BURKHART:  Object to form.

23      A.   I don't know that.

24      Q.   (By Mr. Howard) Okay.  Is it true that

25   while sesame was being stored at Promise Land

1    Farms on behalf of Sesaco, that Sesaco

2    controlled what bins the sesame went into,

3    especially the out-of-condition seed?

4              MS. BURKHART:  Object to form.

5              MR. McRORY:  Objection, form.

6         A.    I don't know that they had that

7    control.

8         Q.    (By Mr. Howard) Did Sesaco have the

9    control over what sesame was actually accepted

10   from farmers?

11        A.    They gave Promise Land direction in

12   that.  Not being a contract expert, I don't

13   know what that implies, but they did give

14   direction to Promise Land on what to accept.

15        Q.    Did Sesaco control when sesame was

16   moved from Promise Land Farms?

17        A.    Again, that's a contract question that

18   I'm not an expert in.  My interpretation of the

19   contract, though, bear in mind I'm not an

20   expert in that area, they would give Promise

21   Land the indication of when to move it.

22        Q.    Okay.

23             MR. HOWARD:  Katie, can you pull up

24   that Sesaco receiver agreement one more time?

25   And I think this will be my last two or three

1    questions.

2              MS. BURKHART:  Sure.  I have it in

3    front of her now.

4         A.   Okay.

5         Q.   (By Mr. Howard) Good.  If you would go

6    to Paragraph 15, Inspection of Records.

7         A.   Okay.  Hang on just a second here.

8         Q.   Yes, ma'am.

9         A.   I have it.

10        Q.   Okay.  And if you would like to read

11   that paragraph, I'm just going to ask you a

12   question or two about it.

13        A.   Okay.  Wait just a second here.

14        Q.   Sure.

15        A.   Okay.

16        Q.   Okay.  Pursuant to that paragraph, it

17   says that "Sesaco has the right but not the

18   obligation" -- and then I'll go down a little

19   bit -- "to inspect the equipment to determine

20   the quantities stored, the storage conditions

21   and the quality control procedures."  Do you

22   see that?

23        A.   Yes, sir.

24        Q.   We know that in fact Sesaco exercised

25   that right, isn't that correct?

1          MS. BURKHART:  Object to form.

2      A.   I believe they inspected in April,

3   yes.

4      Q.   (By Mr. Howard) Okay.  So that would

5   have been inspecting -- and they -- let me

6   start over.  And they had that right in April

7   pursuant to that clause of the receiver

8   agreement, correct?

9      A.   Correct.

10         MR. HOWARD:  That's all I have, Dr.

11  Jones.  I appreciate it very much.

12         THE WITNESS:  Okay.  Thank you.

13         MR. HOWARD:  I will pass the witness.

14         MR. McRORY:  I'll reserve mine.

15         MR. HOWARD:  Katie, I assume you're

16  reserving as well.

17         MS. BURKHART:  Yes.

18         MR. HOWARD:  Okay.  We're done.  But

19  Rick and Katie, can I visit with you one

20  second?

21         MS. BURKHART:  Sure.

22         MR. HOWARD:  Thank you, Dr. Jones.

23         THE WITNESS:  Thank you.  It's been a

24  pleasure.

25         (Discussion off the record.)

1          MR. HOWARD:  I just would like a

2   condensed electronic version is fine for me.

3          MR. McRORY:  I don't need a copy.

4   Thank you.

5          THE REPORTER:  And how about the

6   witness' signature?  Read and sign?

7          MS. BURKHART:  Yes.

8          (Deposition concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J U R A T

STATE OF _____ )
                                                 SS:
COUNTY OF _____ )

I, CAROL L. JONES, Ph.D., P.E., do hereby state under oath that I have read the above and foregoing deposition in its entirety and that the same is a full, true and correct transcription of my testimony so given at said time and place, except for the corrections noted.

_____

CAROL L. JONES, Ph.D., P.E.

Subscribed and sworn to before me, a Notary Public in and for the State of Oklahoma by said witness, CAROL L. JONES, Ph.D., P.E., on the _____ day of _____, 2017.

_____
Notary Public in and for the
State of Oklahoma

My Commission Expires:_____

My Commission Number:_____

DODSON COURT REPORTING & LEGAL VIDEO
425 NW 7TH STREET
OKLAHOMA CITY, OK 73102

C O R R E C T I O N   S H E E T

NAME:          CAROL L. JONES, PH.D., P.E.
CASE:          TOKIO v PROMISE LAND FARMS
DATE:          FEBRUARY 16, 2017
REPORTER:      SUSAN NARVAEZ, CSR

PG/LN      CORRECTION      REASON FOR CORRECTION

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

DODSON COURT REPORTING & LEGAL VIDEO
425 NW 7TH STREET
OKLAHOMA CITY, OK 73102

# C E R T I F I C A T E

STATE OF OKLAHOMA    )
                     )  SS:
COUNTY OF OKLAHOMA    )

        I, Susan Narvaez, a certified
shorthand reporter within and for the State of
Oklahoma, certify that CAROL L. JONES, Ph.D.,
P.E., was sworn to testify the truth; that the
deposition was taken by me in stenotype and
thereafter transcribed by computer and is a
true and correct transcript of the testimony of
the witness; that the deposition was taken on
February 16, 2017, at 425 NW 7th Street,
Oklahoma City, Oklahoma; that I am not an
attorney for nor relative of either party, or
otherwise interested in this action.

        Witness my hand and seal of office on
the 21st day of February 2017.


                    _____
                    SUSAN NARVAEZ, CSR
                    for the State of Oklahoma
                    CSR #00404